UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:09-bk-16733-ABB

Chapter 7

| | |
|---|---|
| IN RE: | : |
| | : |
| Robert Mitton and | : |
|    Melissa Mitton | : |
| | : |
| Debtor(s). | : |
| _____ | : |

---

**NOTICE OF OPPORTUNITY
TO OBJECT AND FOR HEARING**

**PURSUANT TO LOCAL RULE 2002-4, THE COURT WILL CONSIDER THIS MOTION WITHOUT FURTHER NOTICE OR HEARING UNLESS A PARTY IN INTEREST FILES AN OBJECTION WITHIN 21 DAYS FROM THE DATE OF SERVICE OF THIS PAPER. IF YOU OBJECT TO THE RELIEF REQUESTED IN THIS PAPER, YOU MUST FILE YOUR OBJECTION WITH THE CLERK OF THE COURT AT 135 W. CENTRAL BOULEVARD, SUITE 950, ORLANDO, FL 32801, AND SERVE A COPY ON THE MOVANT'S ATTORNEY, LAWRENCE M. WEISBERG, ESQUIRE OF THE LAW OFFICES OF GREENFIELD & COOMBER, P.A., 7000 W. PALMETTO BANK ROAD, #402, BOCA RATON, FLORIDA 33433. IF YOU FILE AND SERVE AN OBJECTION WITHIN THE TIME PERMITTED, THE COURT WILL SCHEDULE A HEARING AND YOU WILL BE NOTIFIED. IF YOU DO NOT FILE AN OBJECTION WITHIN THE TIME PERMITTED, THE COURT WILL CONSIDER THAT YOU DO NOT OPPOSE THE GRANTING OF THE RELIEF REQUESTED IN THE PAPER WILL PROCEED TO CONSIDER THE PAPER WITHOUT FURTHER NOTICE OR HEARING, AND MAY GRANT THE RELIEF REQUESTED.**

---

**AMENDED MOTION BY CARRINGTON MORTGAGE SERVICES, LLC,
SERVICER AND ATTORNEY-IN-FACT FOR, FLAGSTAR BANK, FSB
FOR RELIEF FROM STAY AND ABANDONMENT AND NOTICE OF
OPPORTUNITY TO OBJECT AND FOR HEARING
RE: 2682 Deep Creek Avenue, Deltona, Florida 32725
(As to Clerk of Court Address Within Negative Notice Only)**

Comes Now, CARRINGTON MORTGAGE SERVICES, LLC, SERVICER

AND ATTORNEY-IN-FACT FOR, FLAGSTAR BANK, FSB ("CARRINGTON"), by

and through its undersigned attorneys, moves the Court for an Order Granting Relief of Automatic Stay and in support thereof would show:

1.      That Debtor(s) filed a Chapter 7 petition in bankruptcy in the United States Bankruptcy Court for the Middle District of Florida on November 2, 2009.

2.      This is a motion pursuant to Bankruptcy Rule 4001(a) for a modification of the automatic stay provisions of Section 362(d)(1) of the Bankruptcy Code.

3.      That CARRINGTON, is a secured creditor by virtue of a promissory note and mortgage on real property.  Said real property has the following legal description: Lot 7, Block 1808, of DELTONA LAKES UNIT SEVENTY-ONE, according to the Plat thereof recorded in Plat Book 28, Page 146-152, of the Public Records of Volusia County, Florida a/k/a 2682 Deep Creek Avenue, Deltona, Florida  32725.  The note and mortgage are attached hereto as Exhibit "A".

4.      That payments due pursuant to the aforementioned note and mortgage have been in default, and remain in default since February 1, 2009.

5.      That the aforementioned documents give the secured creditor, CARRINGTON, a first mortgage position on the property known as: 2682 Deep Creek Avenue, Deltona, Florida  32725.

6.      That Debtors are indebted to the secured creditor in the amount of $223,242.10 as set forth in CARRINGTON'S Affidavit of Indebtedness which is attached to this motion as Exhibit "B".

7.      The Volusia County Property Appraiser shows a just market value of the property at $109,368.00.  A copy of the appraisal is attached hereto and made a part hereof as Exhibit "C".

8.      That the Debtors failed to adequately protect the interest of the secured creditor.

9.      That there is no equity in the property.

10.     That CARRINGTON has incurred attorney's fees in the amount of $550.00 as a result of the necessity of filing this Motion.  Said attorney's fees and costs may be recoverable pursuant to state law and the mortgage documents.

11.     That CARRINGTON, is prohibited from instituting and/or completing a foreclosure action in the State Court because of the pendency of this Bankruptcy motion, and that in the absence of the court's Order allowing the secured creditor, CARRINGTON, to proceed with the Foreclosure action, the secured creditor's security will be significantly jeopardized.

12.     Pursuant to M.D. Fla. L.B.R. 9004-2(1) the estimated time required for hearing is five (5) minutes, if required.

WHEREFORE, CARRINGTON, moves this Honorable Court for an Order Granting Relief from the Automatic Stay, prays that the Debtor be cited to appear herein, and that upon final hearing hereof, this Court enter an order modifying the automatic stay under 11 U.S.C. 362(d), to permit CARRINGTON to take any and all steps necessary to exercise any and all rights it may have to the collateral described herein and to gain possession of said collateral and that CARRINGTON have such other and further relief as is just.  Further, CARRINGTON requests that the 10-day stay period imposed by F.R.B.P. 4001(a)(3) be waived.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Amended Motion By Carrington Mortgage Services, LLC, Servicer and Attorney-In-Fact For,

Flagstar Bank, FSB For Relief From Stay And Abandonment and Notice Of Opportunity To Object and For Hearing Re: 2682 Deep Creek Avenue, Deltona, Florida  32725 (As to Clerk of Court Address Within Negative Notice Only), copy of the Affidavit of Indebtedness, copy of the Appraisal, and copies of the Note and Mortgage have been served by either CM/ECF transmission or standard first class U.S. Mail on this 9th day of December, 2009 to the following:

Melissa Mitton, 2694 Leafyway Lane, Deltona, FL  32725

Robert Mitton, 2682 Deep Creek Avenue, Deltona, FL   32725

Stacy A. Eckert, Esquire, Stacy A. Eckert, P.A., 2445 S. Volusia Avenue, Suite C-3, Orange City, FL   32763

Fairwinds Credit Union, 3075 N. Alafaya Trail, Suite 120, Orlando, FL  32826

Emerson C. Noble, P. O. Box 195008, Winter Springs, FL   32719-5008

United States Trustee – ORL7, 135 W. Central Blvd., Suite 620, Orlando, FL   32801

Dated: December 9, 2009                            Respectfully submitted,


                                                   By: /s/  Lawrence M. Weisberg
                                                   Lawrence M. Weisberg, Esquire
                                                   Florida Bar No. 962198
                                                   Counsel for Carrington Mortgage
                                                   Services, LLC et al.
                                                   Greenfield & Coomber, P.A.
                                                   7000 W. Palmetto Park Road, Suite 402
                                                   Boca Raton, Florida   33433
                                                   Telephone: (561) 362-7355
                                                   Facsimile: (561) 828-5858
                                                   E-mail: bankruptcy@lmwlegal.com



After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-530-3


This instrument was prepared by:
JENNIFER BARON
1979 LONGWOOD LAKE MARY RD STE 1005
LONGWOOD, FL 32750


V1 WBCD LOAN #▉▉▉▉2473

———————————————— [Space Above This Line for Recording Data] —————————————————

# MORTGAGE


MIN ▉▉▉▉▉▉▉▉46

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated     OCTOBER 19, 2006,     together with all Riders to this document.
**(B) "Borrower"** is  ROBERT A MITTON Husband and Wife and MELISSA A MITTON Husband and Wife AS JOINT TENANTS.




Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is  FLAGSTAR BANK, FSB.


Lender is a  FEDERALLY CHARTERED SAVINGS BANK,          organized and existing under the laws of
UNITED STATES OF AMERICA.              Lender's address is  5151 CORPORATE DR,
TROY, MI  48098-2639.

**(E) "Note"** means the promissory note signed by Borrower and dated  OCTOBER 19, 2006.      The Note states that Borrower owes Lender  ****************TWO HUNDRED SIX THOUSAND FIFTY AND NO/100
*************************************************** Dollars (U.S.     $206,050.00   )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than NOVEMBER 1, 2036.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01     Initials: _R.M._
© 1999-2004 Online Documents, Inc.                    Page 1 of 9                              FLDEED  0402
10-19-2006 11:49                                                                              _M.M._

_Exh. "A"_

V1 WBCD LOAN #▮▮▮▮▮473

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[x] Adjustable Rate Rider      [ ] Condominium Rider              [ ] Second Home Rider
[ ] Balloon Rider              [ ] Planned Unit Development Rider  [ ] Other(s) [specify]
[ ] 1-4 Family Rider           [ ] Biweekly Payment Rider
[ ] V.A. Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY                    [Type of Recording Jurisdiction] of VOLUSIA
[Name of Recording Jurisdiction]:
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

Tax ID #: 813071080070

which currently has the address of 2682 DEEP CREEK AVE, DELTONA,
                                                                                        [Street] [City]

Florida    32725           ("Property Address"):
         [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

FLORIDA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3010 1/01      Initials: _R.M._
© 1999-2004 Online Documents, Inc.                    Page 2 of 9                          FLEDEED 0402
10-19-2006 11:49

_M.M._

V1 WBCD LOAN # ████2473

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3010 1/01
© 1999-2004 Online Documents, Inc.          Page 3 of 9
10-19-2006 11:49

Initials: _R.M._
PLEDGED 0402
_M·M·_

V1 WBCD LOAN # ███████2473

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.  **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law

Initials: _R.M._
FLEDEED  0402
_M.M._

V1 WBCD LOAN 4████▐473

requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased

V1 WBCD LOAN # ████2473

to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
© 1999-2004 Online Documents, Inc. Page 6 of 9
10-19-2006 11:49

Initials: _R.M._
FLEDEED 0402
_M.M._

V1 WBCD LOAN # ████2473

Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3010 1/01
© 1999-2004 Online Documents, Inc. Page 7 of 9
10-19-2006 11:49

Initials: _R.M._
FLEDEED 0402
_m.m._

V1 WBCD LOAN # 6002742473

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3010 1/01    Initials: R.A.
© 1999-2004 Online Documents, Inc.    Page 8 of 9    FLEDEED 0402
10-19-2006 11:49    M.m

V1 WBCD LOAN #: ~~~~~473

of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

   **23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

   **24. Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

   **25. Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____                    _____ (Seal)
Lisa M. Browning                                    ROBERT A. MITTON

_____                    _____ (Seal)
Deborah Bacom                                       MELISSA A MITTON

State of FLORIDA                                                   County of VOLUSIA

    The foregoing instrument was acknowledged before me this _Oct 19, 2006_ (date)
by __Robert A. Mitton and Melissa Mitton_____

_____,
who is personally known to me or who has produced _FL Drivers Licenses_
as identification.

                                                 _____
                                                 Signature  Lisa M. Browning

         LISA M. BROWNING
         MY COMMISSION # DD 200260              _____
         EXPIRES: April 6, 2007                  Title or Rank
         Bonded Thru Budget Notary Services
                                                 _____
                                                 Serial Number, (if any)

Instrument# 2006-278549 # 10
Book:  5948
Page:  2147

# EXHIBIT "A"

Lot 7, Block 1808, of DELTONA LAKES UNIT SEVENTY-ONE, according to the Plat thereof recorded in Plat Book 28, Page 146-152, of the Public Records of Volusia County, Florida.

V1 WBCD LOAN # ████████473
MIN #: ████████████346

## ADJUSTABLE RATE RIDER WITH INTEREST-ONLY PERIOD
(LIBOR Six-Month Index (As Published In The Wall Street Journal)-Rate Caps)

THIS ADJUSTABLE RATE RIDER with Interest-Only Period is made this 19TH
day of OCTOBER, 2006       and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument")
of the same date given by the undersigned ("Borrower") to secure Borrower's
Adjustable Rate Note with Interest-Only Period (the "Note") to FLAGSTAR BANK,
FSB, A FEDERALLY CHARTERED SAVINGS BANK

("Lender")
of the same date and covering the property described in the Security Instrument and
located at: 2682 DEEP CREEK AVE, DELTONA 32725.

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of   6.375%.  The Note provides for
changes in the interest rate and the monthly payments, as follows:

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the    1ST    day of NOVEMBER, 2011
and on that day every  6TH    month thereafter. Each date on which my interest rate
could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for 6 month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The
most recent Index figure available as of the first business day of the month immediately
preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index that is
based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes
During the Interest-Only Period (as this term is defined in the Note), if I make any
partial Prepayments of Principal, the Note Holder will determine the amount of the
monthly payment that would be sufficient to pay the interest which accrues on the
unpaid Principal of my loan. The result of this calculation will be the new amount of my
monthly payment.
Before each Change Date, the Note Holder will calculate my new interest rate by
adding      TWO AND ONE-FOURTH      percentage point(s) (  2.250%  ) to the
Current Index. The Note Holder will then round the result of this addition to the nearest

MULTISTATE INTEREST-ONLY ADJUSTABLE RATE RIDER WITH INTEREST-ONLY PERIOD-Single Family
Flagstar Form# 3812 5/02
Flagstar modified version of Fannie Mae Uniform Instrument Form 3138       Initials: _R.M._
Online Documents, Inc.                  Page 1 of 3              P5147RDU 0205
                                                        10-19-2006 11:49
                                                          m·m ·

V1 WBCD LOAN ######473

one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D)Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 11.375% or less than 2.250%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than ONE
percentage point(s) ( 1.000% ) from the rate of interest I have been paying for the preceding 6 month(s). My interest rate will never be greater than 11.375%.

### (E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes
During the Interest-Only Period, if I make any partial Prepayments of Principal, the Note Holder will deliver or mail to me a notice of the change in my monthly payment before my next scheduled monthly payment date.

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to

MULTISTATE INTEREST-ONLY ADJUSTABLE RATE RIDER WITH INTEREST-ONLY PERIOD-Single Family
Flagstar Form# 3812 5/02
Flagstar modified version of Fannie Mae Uniform Instrument Form 3138
Online Documents, Inc.                     Page 2 of 3

Initials: _R. M._
                    P5147RDU
10-19-2006 11:49
_m.m_

V1 WBCD LOAN # ■■■■■473

Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
ROBERT A. MITTON

_____ (Seal)
MELISSA A MITTON

MULTISTATE INTEREST-ONLY ADJUSTABLE RATE RIDER WITH INTEREST-ONLY PERIOD-Single Family
Flagstar Form# 3812 5/02
Flagstar modified version of Fannie Mae Uniform Instrument Form 3138
Online Documents, Inc.               **Page 3 of 3**                    P5147RDU
                                                          10-19-2006 11:49

PREPARED BY AND RETURN TO:
Steven B. Greenfield, P.A.
Suite 402
7000 West Palmetto Park Road
Boca Raton, Florida 33433
Loan#: ████████73
Our file number: 09F0191

## ASSIGNMENT OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS That

MERS as nominee for Flagstar Bank, FSB, party of the first part,

in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, received from or on behalf of

Flagstar Bank, FSB, party of the second part,

at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said party of the second part, a certain mortgage dated October 19, 2006 made by Robert A. Mitton and Melissa A. Mitton, husband and wife, in favor of MERS as nominee for Flagstar Bank, FSB, and recorded in Official Records Book 5948 Page 2138 of the public records of Volusia County, upon the following described piece of parcel of land, situate and being in said County and State, to-wit:

### LOT 7, BLOCK 1808, DELTONA LAKES UNIT SEVENTY-ONE, ACCORDING TO THE MAP OR PLAT THEREOF AS RECORDED IN PLAT BOOK 28, PAGE(S) 146, PUBLIC RECORDS OF VOLUSIA COUNTY, FLORIDA.

TOGETHER with the note or obligation described in said mortgage, and the moneys due and to become due thereon, with interest accrued and owing thereon,

TO HAVE AND TO HOLD the same unto the said party of the second part, heirs, legal representatives, successors and assigns forever.

IN WITNESS WHEREOF the party of the first part has caused these presents to be executed in its name the ___14___ day of ~~July, 2009~~ November 2009

Signed, sealed and delivered in the presence of:

MERS as nominee for Flagstar Bank, FSB

By: Tom Croft
Its: VICE PRESIDENT of REO

STATE OF California
COUNTY OF Orange

The foregoing instrument was acknowledged before me this 9 day of November, 2009 by Tom Croft ———— who is personally known to me.

(SEAL)

N DEETER
COMM. # 1712322
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
MY COMM. EXP. DEC. 23, 2010

Notary Signature

v1 WBCD LOAN #‍‍‍‍‍‍‍473
MIN #‍‍‍‍‍‍‍7346

## ADJUSTABLE RATE NOTE WITH INTEREST-ONLY PERIOD
(LIBOR Six-Month Index (As Published In The Wall Street Journal)-Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

OCTOBER 19, 2006　　　　　DELTONA,　　　　　FLORIDA
[Date]　　　　　　　　　　[City]　　　　　　　　[State]

2682 DEEP CREEK AVE, DELTONA, FL 32725
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $206,050.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.375%. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
**(A) Time and Place of Payments**
I will pay only the interest on the unpaid principal balance of the Note for the first 120 payments (the "Interest-Only Period"). Thereafter, I will pay principal and interest by making payments every month as provided below.
I will make my monthly payments on the 1ST day of each month beginning on DECEMBER 1, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on NOVEMBER 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
5151 CORPORATE DR
TROY, MI 48098-2639

or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $1,094.64. This amount may change.
**(C) Monthly Payment Changes**
During the Interest-Only Period, changes in my monthly interest payment will reflect changes in the unpaid principal of my loan. Thereafter, changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the 1ST day of NOVEMBER, 2011, and on that day every 6TH month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
During the Interest-Only Period, if I make any partial prepayments of principal, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay the interest which accrues on the unpaid principal of my loan. The result of this calculation will be the new amount of my monthly payment.
Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-FOURTH percentage point(s) ( 2.250% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

473

2682 Deep Creek Ave Deltona, FL 32725

R. M.
m.m.

V1 NBCD LOAN # ███████473

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than   11.375%   or less than
2.250%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more
than   ONE                         percentage point(s) (   1.000%  ) from the rate of interest I have
been paying for the preceding   6          month(s). My interest rate will never be greater than   11.375%.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment
beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes
again.

**(F) Notice of Changes**
During the Interest-Only Period, if I make any partial prepayments of principal, the Note Holder will deliver or mail
to me a notice of the change in my monthly payment before my next scheduled monthly payment date.
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly
payment before the effective date of any change. The notice will include information required by law to be given to me
and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known
as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate
a payment as a Prepayment if I have not made all the monthly payments due under this Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will
use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply
my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to
reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of
my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment during the
interest-Only Period will reduce the amount of my monthly payments following the partial prepayment. My partial
prepayment after the Interest-Only Period may reduce the amount of my monthly payments after the first Change Date
following my partial prepayment. However, any reduction due to my partial Prepayment may be offset by an interest
rate increase.

**6. LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest
or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any
such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any
sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose
to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund
reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**
**(A) Late Charges for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of   15        calendar
days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be  5.000%
of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each
late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount
by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid
and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is
mailed to me or delivered by other means.
**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described
above, the Note Holder will still have the right to do so if I am in default at a later time.
**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right
to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable
law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given
by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give
the Note Holder a notice of my different address.
Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note
will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different
address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises
made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser
of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations
of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note
Holder may enforce its rights under this Note against each person individually or against all of us together. This means
that any one of us may be required to pay all of the amounts owed under this Note.

FLORIDA INTEREST-ONLY ADJUSTABLE RATE NOTE WITH INTEREST-ONLY PERIOD-Single Family
Flagstar modified version of Fannie Mae Uniform Instrument Form 3520
Online Documents, Inc.                                   Page 2 of 3

Flagstar Form# 3611 6/02
Initials:
FL5147NT
10-19-2006 11:49

 

████ Deer Creek Run Oviedo, FL 32765

$R.M.$
$m \cdot m \cdot$

V1 WBCD LOAN # ████2473

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
ROBERT A. MITTON

_____ (Seal)
MELISSA A MITTON

[Sign Original Only]

FLORIDA INTEREST-ONLY ADJUSTABLE RATE NOTE WITH INTEREST-ONLY PERIOD-Single Family       Flagstar Form# 3811 5/02
Flagstar modified version of Fannie Mae Uniform Instrument Form 3520
Online Documents, Inc.                     Page 3 of 3                              FL5147NT
                                                                          10-19-2006 11:49

████████████ ████473

5552 Bear Creek Ave Baldwin, FL 32225

Case 6:09-bk-16733-ABB    Doc 13    Filed 12/09/09    Page 22 of 27

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:09-bk-16733-ABB

Chapter 7

IN RE:                              :
                                    :
Robert Mitton and                   :
  Melissa Mitton                    :
                                    :
                Debtor(s).          :
                                    :

## AFFIDAVIT OF INDEBTEDNESS

Affiant, Kristie Perez is (Job Title)_Bankruptcy Specialist_____, Carrington

Mortgage Services, LLC in _Santa Ana, California_____ (Bank Dept.) ("Carrington")

and is fully familiar with the instant action and makes this affidavit on her own personal

knowledge.    She is Carrington's custodian of the business records concerning the

transactions that were referred to in the civil action to foreclose Carrington's mortgage in

State court. The records are kept in the ordinary course of business and reflect events at

or near the time of the entry into the records.

According to those records, as of February 1, 2009, Carrington was owed the

following sums on the $206,050.00 loan:

| | |
|---|---|
| Principal: | $205,992.44 |
| Interest From Last Installment | $ 11,123.19 |
| Outstanding Late Charges | $    105.98 |
| Other Fees | $  1,669.34 |
| Escrow Balance | $  4,351.15 |

$Exh. "B"$

To this amount would be added per diem amounts for the period after November 1, 2009. The per diem amount for the loan is $__35.9781 from 11/1/09 to 11/18/2009___ based upon a contract rate of 6.375% per annum.

Plaintiff has retained Lawrence M. Weisberg, Esquire from Greenfield & Coomber, P.A. to prosecute this action and has agreed to pay the firm reasonable attorney fees.

END OF AFFIDAVIT

Kristie Perez

Sworn to and subscribed by _____, for Carrington Mortgage Services, LLC before me on this day of November _____, 2009 and who is personally known to me or who has produced identification.

(SEAL)                          _____
                                Notary Public
                                attached

2

# Jurat

State of California

County of _Orange_

Subscribed and sworn to (or affirmed) before me on this _19_ day of _November_,

_2009_   by _Kristie Perez_,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

N. DEETER
COMM. # 1712322
NOTARY PUBLIC-CALIFORNIA
ORANGE COUNTY
My Comm. Exp. Dec. 23, 2010

Signature   N. Deeter, Notary Public          (Notary seal)

---

# OPTIONAL INFORMATION

### INSTRUCTIONS FOR COMPLETING THIS FORM

*The wording of all Jurats completed in California after January 1, 2008 must be in the form as set forth within this Jurat. There are no exceptions. If a Jurat to be completed does not follow this form, the notary must correct the verbiage by using a jurat stamp containing the correct wording or attaching a separate jurat form such as this one which does contain proper wording. In addition, the notary must require an oath or affirmation from the document signer regarding the truthfulness of the contents of the document. The document must be signed AFTER the oath or affirmation. If the document was previously signed, it must be re-signed in front of the notary public during the jurat process.*

DESCRIPTION OF THE ATTACHED DOCUMENT

_Affidavit of Indebtedness_
(Title or description of attached document)

_1662_
(Title or description of attached document continued)

Number of Pages _____ Document Date_____

_____
(Additional information)

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the jurat process is completed.
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Signature of the notary public must match the signature on file with the office of the county clerk.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different jurat form.
  - ❖ Additional information is not required but could help to ensure this jurat is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
- Securely attach this document to the signed document

2008 Version CAPA v1.9.07 800-873-9865 www.NotaryClasses.com



**Volusia County Appraiser's Office**

The Volusia County Property Appraiser makes every effort to produce the most accurate information possible. No warranties, expressed or implied, are provided for the data herein, its use or interpretation. The values shown in the Total Values section at the end of the Property Record Card are "Working Tax Roll" values, as our valuations proceed during the year. These Working Values are subject to change until the Notice of Proposed Taxes (TRIM) are mailed in mid-August. For Official Tax Roll Values, see the History of Values section within the property record card below.

| Last Updated: 11-10-2009 Today's Date: 11-15-2009 | Volusia County Property Appraiser's Office Property Record Card (PRC) Morgan B. Gilreath Jr., M.A., A.S.A., C.F.A. Property Appraiser | Volusia County FLORIDA |
|---|---|---|
| Full Parcel ID Short Parcel ID | 30-18-31-71-08-0070 8130-71-08-0070 | Mill Group | 016 Deltona |
| Alternate Key | 2901985 | Millage Rate | 21.81219 |
| Parcel Status | Active Parcel | PC Code | 01 |
| Date Created | 21 DEC 1981 | | |
| Owner Name | MITTON ROBERT A & MELISSA A | | GO TO ADD'L OWNERS |
| Owner Name/Address 1 | | | ESTIMATE TAXES |
| Owner Address 2 | 2682 DEEP CREEK AVE | | |
| Owner Address 3 | DELTONA FL | | |
| Owner Zip Code | 32725 | | |
| Location Address | 2682 DEEP CREEK AV DELTONA | | |

## LEGAL DESCRIPTION

LOT 7 BLK 1808 DELTONA LAKES UNIT 71 MB 28 PGS 146-152 INC P

ER OR 4269 PG 0204 PER OR 5948 PGS 2136-2137

## SALES HISTORY

GO TO ADD'L SALES

| # | BOOK | PAGE | DATE | INSTRUMENT | QUALIFICATION | IMPROVED? | SALE PRICE |
|---|---|---|---|---|---|---|---|
| 1 | 5948 | 2136 | 10/2006 | Warranty Deed | Qualified Sale | Yes | 216,900 |
| 2 | 4269 | 0204 | 12/1997 | Warranty Deed | Qualified Sale | Yes | 86,900 |
| 3 | 4034 | 3641 | 8/1995 | Warranty Deed | Qualified Sale | Yes | 81,900 |

## HISTORY OF VALUES

GO TO ADD

| YEAR | LAND | BLDG(S) | MISC | JUST | ASD | SCH ASD | NS ASD | EXEMPT | TXBL | SCH TXBL | AD E |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | 27,200 | 81,044 | 1,153 | 109,397 | 109,397 | 109,397 | 109,397 | 0 | | 109,397 | 109,397 | 0 |

$Exh. "C"$

Volusia County Property Appraiser Online    Case 6:09-bk-16733-ABB    Doc 13    Filed 12/09/09    http://web2.vcgov.org/cgi-bin/mainSrch3.cgi  Page 26 of 27

| 2008 | 44,000 | 110,921 | 1,181 | 156,102 | 156,102 | 156,102 | 156,102 | 0 | | 156,102 | 156,102 | 0 |

## LAND DATA

| TYPE OF LAND USE | FRONTAGE | DEPTH | # OF UNITS | UNIT TYPE | RATE | DPH | LOC | SHP | PHY | JUST VAL |
|---|---|---|---|---|---|---|---|---|---|---|
| IMP SFR TO .5AC PAVD | 80.0 | 125.0 | 80.00 | FRONT FEET | 340.00 | 100 | 100 | 100 | 100 | 27,200 |

| NEIGHBORHOOD CODE | 8380 | DELTONA LAKES UNIT 71 |
|---|---|---|

| | TOTAL LAND CLASSIFIED | 0 |
|---|---|---|
| | TOTAL LAND JUST | 27,200 |

## BUILDING CHARACTERISTICS

**BUILDING 1 OF 1**

GO TO BLDG SKETCH

| Effective Age | 7 | Next Review | 2013 | Obsolescence | | Functional | 0% |
|---|---|---|---|---|---|---|---|
| | | Year Built | 1995 | | | Locational | 0% |
| Quality Grade | 300 | Architecture | | | | Base Perimeter | 188 |

| Improvement Type | Single Family | | | |
|---|---|---|---|---|
| Roof Type | HIP | Bedrooms | 3 | 7FixBath | 0 |
| Roof Cover | Asphalt / Composition Shingle | Air Conditioned | Yes | 6FixBath | 0 |
| Wall Type | Drywall | Fireplaces | 0 | 5FixBath | 0 |
| Floor Type | Carpet | XFixture | 0 | 4FixBath | 1 |
| Foundation | Concrete Slab | Heat Method 1 | Forced Ducted | 3FixBath | 1 |
| Heat Source 1 | Electric | Heat Method 2 | | 2FixBath | 0 |
| Heat Source 2 | | | | |

| SECTION # | AREA TYPE | EXTERIOR WALL TYPE | NUMBER OF STORIES | YEAR BUILT | ATTIC FINISH | % BSMT AREA | % BSMT FINISH | FLOOR AREA |
|---|---|---|---|---|---|---|---|---|
| 1 | Heated Living Area | CONCRETE BLOCK STUCCO | 1.0 | 1995 | N | 0.00 | 0.00 | 1692 Sq. Feet |
| 2 | Finished Open Porch | Non-Applicable | 1.0 | 1995 | N | 0.00 | 0.00 | 45 Sq. Feet |
| 3 | Unfinished Garage | Non-Applicable | 1.0 | 1995 | N | 0.00 | 0.00 | 380 Sq. Feet |

| 4 | Unfinished Screen Porch | Non-Applicable | 1.0 | 2000 | N | 0.00 | 0.00 | 222 Sq. Feet |

## MISCELLANEOUS IMPROVEMENTS

| TYPE | NUMBER UNITS | UNIT TYPE | LIFE | YEAR IN | GRADE | LENGTH | WIDTH | DEPR. VALUE |
|---|---|---|---|---|---|---|---|---|
| SHED RES | 80 | SF | 50 | 2000 | 4 | 10 | 8 | 1,124 |

## PLANNING AND BUILDING

| PERMIT NUMBER | PERMIT AMOUNT | DATE ISSUED | DATE COMPLETED | DESCRIPTION | OCCUPANCY NBR | OCCUPANCY BLDG |
|---|---|---|---|---|---|---|
| 19950522022 | 0.00 | 5-22-1995 | 5-24-1995 | TREE PROTECTION | | 0 |
| 19950524037 | 74,048.00 | 5-26-1995 | 8-29-1995 | SINGLE FAMILY-DETACH | | 1 |

| TOTAL VALUES | The values shown in the Total Values section at the end of the Property Record Card are "Working Tax Roll" values, as our valuations proceed during the year. These Working Values are subject to change until the Notice of Proposed Taxes (TRIM) are mailed in mid-August. For Official Tax Roll Values, see the History of Values section above. |
|---|---|

**The Volusia County Property Appraiser makes every effort to produce the most accurate information possible. No warranties, expressed or implied, are provided for the data herein, its use or interpretation.**

| Land Value | 27,200 | New Construction Value | 0 |
|---|---|---|---|
| Building Value | 81,044 | City Econ Dev/Historic Taxable | 0 |
| Miscellaneous | 1,124 | | |
| Total Just Value | 109,368 | Previous Total Just Value | 109,397 |
| School Assessed Value | 109,368 | Previous Assessed | 0 |
| Non-School Assessed Value | 109,368 | Previous Non-School Assessed | 109,397 |
| Exemption Value | 0 | Previous Exemption Value | 0 |
| Additional Exemption Value | 0 | Previous Add'l Exempt Value | 0 |
| School Taxable Value | 109,368 | Previous Taxable | 0 |
| Non-School Taxable Value | 109,368 | Previous Non-School Taxable | 109,397 |

MapIT    PALMS

Map Kiosk

**MapIT:** Your basic parcel record search including sales.

**PALMS:** Basic parcel record searches with enhanced features.

**Map Kiosk:** More advanced tools for custom searches on several layers including parcels.

Parcel Notes



Click Here for Tax Bill Info